UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT PIERCE DIVISION

STATE OF FLORIDA,

   *Plaintiff*,

   v.                                                                                     Case No. 2:24-cv-14348

MERRICK GARLAND, in his official
capacity as U.S. Attorney General,

   *Defendant*.

_____/

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1. In just a two-month period, Donald J. Trump (President Trump) has faced two credible attempts to take his life.

2. In one attempt, a gunman fired shots at President Trump's head, nearly killing him, and was even able to wound the former President's ear. The alleged failures by the Secret Service with respect to that event were so severe that the head of that agency resigned.

3. In the other attempt, a gunman was able to hide for nearly twelve hours near the sixth green of Trump International Golf Club in West Palm Beach, Florida. By the time the Secret Service found the shooter, he had "ma[de] it within several hundred yards" of President Trump.[1]

---

[1] Alana Wise, *2 close calls have the Secret Service facing criticism and an uncertain future*, NPR (Sept. 19, 2024), https://www.npr.org/2024/09/19/g-s1-23618/secret-service-trump-shooting-gunman-problems.

4. Two days after this second attempt, on September 17, 2024, Governor Ron DeSantis signed Executive Order Number 24-197.[2] The Executive Order directed the Florida Department of Law Enforcement (FDLE) and Florida Highway Patrol (FHP) to work with relevant partners and with the Office of Statewide Prosecution to ensure appropriate state charges are brought. *Cf. Crossley v. California*, 168 U.S. 640, 641 (1898) ("[I]t is settled law that the same act may constitute an offense against the United States and against a state.").

5. Within days of Governor DeSantis signing the Executive Order, however, officials at the Federal Bureau of Investigation (FBI), under the supervision of the Department of Justice (DOJ), indicated that the State of Florida must suspend its investigation. As the basis for this demand, the federal officials cited 18 U.S.C. § 351(f), which purports to temporarily "suspend the exercise of jurisdiction by a State or local authority" when the federal government asserts jurisdiction over an assassination attempt of a major presidential candidate.

6. In conversations with federal officials and in subsequent correspondence, these officials have stated that Florida may not conduct its own investigation, may not interview witnesses, and may only cooperate with the federal government's investigation.

7. Because § 351(f) does not prohibit such conduct, and because it would violate the Tenth Amendment if it reached so far, Florida sues to vindicate its

---

[2] Available at https://www.flgov.com/wp-content/uploads/2024/09/EO-24-197.pdf.

sovereign interest to investigate violations of state law, as delay may impact the outcome of any prosecution.

## PARTIES

8. Plaintiff the State of Florida is a sovereign State and has the authority and responsibility to protect its sovereign interests and the health, safety, and welfare of its citizens. As the State's Chief Legal Officer, Attorney General Ashley Moody is authorized to represent the interests of the State in civil suits. § 16.01(4), (5), Fla. Stat.

9. Defendant Merrick Garland is the U.S. Attorney General and the head of the Department of Justice (DOJ). The Federal Bureau of Investigation (FBI) is a component of DOJ and is under Defendant Garland's supervision and control.

## JURISDICTION AND VENUE

10. Florida sues Defendant Garland under 5 U.S.C. § 702, 28 U.S.C. §§ 1361 and 2201–02, the U.S. Constitution, and the Court's equitable powers.

11. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1346, and 1361, and the U.S. Constitution.

12. Venue is proper in this district and division for two reasons.

13. First, venue is proper under 28 U.S.C. § 1391(e)(1) because Defendant Garland is a federal officer and Plaintiff the State of Florida is a resident of every judicial district in its sovereign territory, including this district (and division). *See California v. Azar*, 911 F.3d 558, 570 (9th Cir. 2018); *Florida v. United States*, No. 3:21-cv-1066, 2022 WL 2431443, at *2 (N.D. Fla. Jan. 18, 2022).

14. Second, a substantial part of the events or omissions giving rise to the claims occurred here. *See* 28 U.S.C. § 1391(b)(2). Virtually all the relevant events occurred in this district. And one of the most important events occurred in this division because, as further detailed below, the first time the federal government communicated to Florida regarding § 351(f) was on a phone call with a Florida law enforcement officer based in Fort Pierce.

## BACKGROUND

### Factual Background

15. On September 15, 2024, President Trump played a round of golf at Trump International Golf Club in West Palm Beach, Florida.

16. During that round, the Secret Service discovered an armed gunman, later identified as Ryan Wesley Routh, hiding near the sixth green.

17. After Secret Service agents fired at his position, Mr. Routh fled on foot and later by car. Officers from the Martin County Sheriff's Office, in coordination with the Palm Beach County Sheriff's Office, later located Mr. Routh and took him into custody.

18. It is reasonably clear from all the facts and circumstances, including a note authored by Mr. Routh himself, that Mr. Routh intended to assassinate President Trump.

19. This was the second assassination attempt on President Trump in as many months. In the first attempt, a gunman was able to shoot President Trump in the ear and nearly kill him.

20. During the first attempt, the Secret Service failed to discharge its duties in a variety of ways,[3] including by allowing the gunman access to a rooftop with a clear line of sight to President Trump. Within days of these failures, the head of the Secret Service resigned.

21. With respect to the second attempt, similar concerns have been raised, such as how a gunman managed to get so close to President Trump and hide for twelve hours undetected.

22. Two days after this second attempt, on September 17, 2024, Governor Ron DeSantis signed Executive Order Number 24-197.[4] The Executive Order directed FDLE and FHP to work with relevant partners and with the Office of Statewide Prosecution to ensure appropriate state charges are brought.

23. Those charges may ultimately include attempted murder, fleeing and eluding, and charges related to Mr. Routh's unlawful possession of firearms. *See* § 782.04, Fla. Stat. (murder); *id.* § 777.04 (liability for attempted crimes); *id.* § 316.1935 (fleeing and eluding); *id.* § 790.23 (felon in possession).

24. Additionally, the State may pursue charges against Mr. Routh stemming from injuries caused by his flight from law enforcement after the assassination attempt.

25. Almost immediately, however, federal officials began taking steps to halt the State's investigation.

---

[3] *Report of the Independent Review Panel on the July 13, 2024 Assassination Attempt in Butler Pennsylvania*, Independent Review Panel (Oct. 15, 2024), https://www.dhs.gov/sites/default/files/2024-10/24_1017_opa-Independent-Review-Panel-Final-Report-and-Accompanying-Materials.pdf.

[4] Available at https://www.flgov.com/wp-content/uploads/2024/09/EO-24-197.pdf.

26. Only a few days after Governor DeSantis signed the Executive Order, FBI Special Agent in Charge Jeffrey Veltri called the FDLE Special Agent in Charge in Fort Pierce. During that phone call, Mr. Veltri directed FDLE to 18 U.S.C. § 351(f).

27. Mr. Veltri did so even though, at that time, the federal government had only charged Mr. Routh with firearms related charges and had not charged him for attempted assassination under § 351.

28. Section 351(f) purports to temporarily "suspend the exercise of jurisdiction by a State or local authority" where the federal government asserts "investigative or prosecutive jurisdiction" over violations of § 351, which would include the attempted assassination of a major presidential candidate.

29. In a subsequent meeting between Florida's Statewide Prosecutor Nicholas Cox and U.S. Attorney Markenzy Lapointe of the Southern District of Florida, the U.S. Attorney again mentioned § 351(f). In this meeting, U.S. Attorney Lapointe suggested that Florida should not interview witnesses until the federal investigation was completed.

30. In light of these statements and other attempts to block Florida's investigation, on September 23, 2024, Florida Attorney General Ashley Moody wrote a letter to U.S. Attorney Lapointe and FBI Director Christopher Wray. *See* Ex. 1. The letter covered several things.

31. First, the letter noted the lack of public confidence in the federal investigation—specifically (a) the Secret Service's repeated failures to adequately protect President Trump, (b) the federal government's ongoing prosecution of the

6

victim, President Trump, and (c) the fact that Mr. Veltri, who is leading the investigation, has made statements in the past that some believe demonstrate a bias against President Trump. The letter further noted that "having Florida conduct its own investigation . . . would mitigate public concern regarding the credibility and reliability of these institutions." Ex. 1 at 3.

32. Second, the letter noted that, as a legal matter, general references to § 351(f) in a verbal conversation were likely insufficient to invoke that provision. Ex. 1 at 4.

33. Third, the letter asked for clarification regarding whether § 351(f) was being formally invoked and, if so, "what you believe this provision prohibits and how the federal government would enforce it." Ex. 1 at 4.

34. Notably, when General Moody sent that letter, DOJ had only charged Mr. Routh with illegal possession of firearms. DOJ had not charged Mr. Routh with any violation of § 351.

35. After DOJ received General Moody's letter, DOJ charged Mr. Routh with a violation of § 351(c), which prohibits the attempted assassination of a major presidential candidate.

36. On September 30, a week after receiving General Moody's letter, U.S. Attorney Lapointe sent a response letter. Ex. 2.

37. U.S. Attorney Lapointe's letter claimed that "[t]he federal indictment returned last week—which post-dates your letter—resolves any potential uncertainty about whether 18 USC 351(f) applies here." Ex. 2 at 3.

7

38. U.S. Attorney Lapointe's letter did not provide any response to General Moody's request for guidance regarding what § 351(f) prohibits or how the federal government plans to enforce it.

39. Following this unequivocal assertion of § 351(f), the federal government almost immediately asked the trial court assigned to the criminal case to remove the case from the trial calendar until further notice. *See* Unopposed Motion to Designate Case as Complex Under Speedy Trial Act, *United States v. Routh*, Doc. 30, 9:24-cr-80116 (S.D. Fla. Oct. 2, 2024).

## Legal Background

### 18 U.S.C. § 351

40. Section 351 prohibits the killing, kidnapping, attempting killing or kidnapping, or assaulting of a variety of individuals. 18 U.S.C. § 351(a)–(c), (e).

41. These individuals include members of Congress, certain high-ranking executive branch officials, justices of the Supreme Court, nominees for certain positions, and "major Presidential or Vice Presidential candidate[s]" as defined in 18 U.S.C. § 3056(a)(7). *See* 18 U.S.C. § 351(a).

42. Subsection (f) of § 351 states as follows: "If Federal investigative or prosecutive jurisdiction is asserted for a violation of this section, such assertion shall suspend the exercise of jurisdiction by a State or local authority, under any applicable State or local law, until Federal action is terminated."

8

43. It appears that no court has interpreted this provision. But applying traditional principles of statutory interpretation, the statute is far narrower than DOJ asserts.

44. Specifically, all the statute prohibits is the State's "*exercise* of jurisdiction" under "any applicable State or local law, until Federal action is terminated." 18 U.S.C. § 351(f) (emphasis added).

45. That phrase—"exercise of jurisdiction"—does not refer to all investigatory actions. Rather, it refers to the formal exercise of jurisdiction over a person or thing—namely, a seizure. That is true for several reasons.

46. First, the phrase "exercise jurisdiction" stands in contrast to the phrase "assert[] . . . jurisdiction," which is what DOJ must do to trigger the statute. *See Sosa v. Alvarez-Machain*, 542 U.S. 692, 711 n.9 (2004) ("[W]hen the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended." (quotations omitted)).

47. Given this contrast, exercising jurisdiction involves something more significant than asserting jurisdiction. For example, if someone "asserts" a right to vote, that person may take any number of actions short of casting a ballot. If someone seeks to "exercise" such a right, however, that person may do so only by the formal act of casting a ballot.

48. Second, and relatedly, the phrase "exercise jurisdiction" is most frequently used in a manner consistent with Florida's reading of the statute—specifically, in reference to taking a person or thing into custody.

9

49. "Exercising jurisdiction" arises most often in applying the rule of comity. Under that rule, when a state government and the federal government both assert jurisdiction over the same person or thing, "the court which first takes the subject-matter of the litigation into its control, whether this be person or property, must be permitted to exhaust its remedy, to attain which it assumed control, before the other court shall attempt to take it for its purpose." *Ponzi v. Fessenden*, 258 U.S. 254, 260–61 (1922).

50. In rule of comity cases, the first sovereign to take custody of the person or thing—thus triggering the rule of comity—is said to "exercise its jurisdiction over the" person or thing. *Rooney v. Hunter*, 64 F. Supp. 165, 168 (D. Kan. 1945); *accord United States ex rel. Helwig v. Klopfinstrin*, 137 F. Supp. 214, 215 (W.D. Pa. 1956); *In re James*, 18 F. 853, 857 (C.C.W.D. Mo. 1884).

51. Applying this understanding of "exercise jurisdiction," § 351(f) grants the federal government a right to custody of Mr. Routh even if the State arrests him first.[5] In other words, the purpose of § 351(f) is merely to modify the rule of comity, which would otherwise compel the federal government to wait for the State to prosecute and incarcerate Mr. Routh before it could do so.

52. Finally, even if the State's reading is only one of multiple plausible readings, the Court should adopt the State's reading. As explained below, the federal

---

[5] In fact, the State did arrest Mr. Routh first and complied with § 351(f) by acquiescing to the federal government taking custody of Mr. Routh.

10

government's reading would raise a substantial constitutional question because it would likely render § 351(f) unconstitutional under the Tenth Amendment.

<u>The Tenth Amendment and the Supremacy Clause</u>

53. The Tenth Amendment to the U.S. Constitution states that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

54. This Amendment confirms that "[t]he Constitution confers on Congress not plenary legislative power but only certain enumerated powers," and thus, "all other legislative power is reserved for the States." *Murphy v. NCAA*, 584 U.S. 453, 477 (2018).

55. As relevant here, the Supreme Court has interpreted the Tenth Amendment to impose an anti-commandeering rule. Under that rule "'[t]he Federal Government' may not 'command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program.'" *Murphy*, 584 U.S. at 473 (quoting *Printz v. United States*, 521 U.S. 898, 935 (1997)).

56. Unconstitutional commandeering can include ordering state officials to take some action, such as conducting background checks. *E.g.*, *Printz*, 512 U.S. at 905. And it can also involve ordering state officials not to do something, such as enacting particular legislation. *E.g.*, *Murphy*, 548 U.S. at 474.

57. Commandeering, however, is different from federal preemption.

58. Preemption occurs as a result of the Supremacy Clause of the U.S. Constitution, which expressly designates federal law as the "supreme law of the land."

11

U.S. Const., art. VI, cl. 2. But "that Clause is not an independent grant of legislative power to Congress. Instead, it simply provides 'a rule of decision.'" *Murphy*, 584 U.S. at 477 (quoting *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324 (2015)).

59.     When a federal law preempts a state law, "a state law confers rights or imposes restrictions that conflict with the federal law; and therefore the federal law takes precedence and the state law is preempted." *Id.* Thus, when federal law preempts state law, the federal law creates "a federal right to engage in certain conduct subject only to certain (federal) constraints." *Id.* at 479.

60.     Importantly, "the Constitution 'confers upon Congress the power to regulate individuals, not States.'" *Id.* at 477 (quoting *New York v. United States*, 505 U.S. 144, 166 (1992)). As such, to constitute a valid preemption provision, a federal law "must be best read as one that regulates *private actors*." *Id.* (emphasis added).

61.     By contrast, a federal law that "dictates what" state officials "may and may not do" is not a valid preemption provision and "violates the anticommandeering rule" of the Tenth Amendment to the U.S. Constitution. *Id.* at 474.[6]

---

[6] While *Murphy* addresses legislative acts, other case law makes clear that the anti-commandeering rule applies equally when the federal government "harnesses a State's . . . executive authority." *Haaland v. Brackeen*, 599 U.S. 255, 281 (2023); *e.g.*, *Printz*, 512 U.S. at 905 (reviewing a provision of federal law requiring state executive officials to conduct background checks for a federal regulatory program).

**Injuries to the State of Florida**

62. The mere fact that the State may not carry out its right to investigate violations of its own laws is a sovereign injury sufficient to trigger Article III jurisdiction. But the State's concrete injuries go beyond that harm to its sovereignty.

63. According to U.S. Attorney Lapointe's letter, Florida law enforcement officials may not conduct any investigative activities of their own until after "the conclusion of the federal prosecution." Ex. 2 at 3. This means that, according to the federal government, the State may not interview witnesses or execute warrants or subpoenas.

64. That is significant. Evidence disappears, memories fade, and the State has no way to force the federal government to cooperate in the State's prosecution. *See United States ex rel. Touhy v. Ragen*, 340 U.S. 462, 465 (1951).

65. Every day that Florida is prevented from investigating, the State's case becomes harder to prove at trial. By contrast, the federal government suffers no injury from Florida investigating state law crimes, as the State has no intention of interfering with or obstructing the federal investigation.

66. To prevent further injury, Florida seeks the following relief.

# CLAIMS

## COUNT 1

### Declaratory Judgment Act

67. Florida repeats and incorporates by reference ¶¶ 1–66.

68. The Declaratory Judgment Act (DJA) provides that, "[i]n a case of actual controversy within its jurisdiction, . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201.

69. The DJA empowers a party faced with a "genuine threat of enforcement" to bring an action to seek a court's declaration as to whether an expected government action is lawful. *MedImmune, Inc. v. Genentech, Inc.,* 549 U.S. 118, 129 (2007).

70. Moreover, courts "normally do not require plaintiffs to 'bet the farm . . . by taking the violative action' before 'testing the validity of the law.'" *Free Enter. Fund v. Pub. Acct. Oversight Bd.*, 561 U.S. 477, 490 (2010) (quoting *MedImmune, Inc.*, 549 U.S. at 129).

71. The federal government has demonstrated a "genuine threat of enforc[ing]" § 351(f) to bar Florida from investigating the latest assassination attempt

against President Trump, as well as other state law crimes emanating from Mr. Routh's actions. *MedImmune, Inc.*, 549 U.S. at 129.

72. As discussed above, federal officials have stated in writing that § 351(f) is in effect against the State of Florida and have told state officials that basic investigative activities, such as interviewing witnesses, are illegal under federal law. Moreover, the federal government indicated in its letter that it will not allow Florida to access evidence until *after* the federal government has concluded its own investigation. *See* Ex. 2 at ("[Section 351 (f)] does not preclude state prosecutions permissibly *following the conclusion of the federal prosecution*—and in no way prevents the sharing of federal evidence with state authorities *after the federal matter has ended*." (emphasis added)).

73. As explained above, the federal government dramatically overreads § 351(f), which merely modifies the traditional rule of comity and allows the federal government to take custody of Mr. Routh over the State's objection.

74. A declaratory judgment action is therefore proper to clarify whether the federal government can lawfully prevent Florida's investigation of state law violations under § 351(f) until the conclusion of the federal prosecution. *See GTE Directories Publ'g Corp. v. Trimen Am., Inc.*, 67 F.3d 1563, 1567 (11th Cir. 2011) (A suit brought under the Declaratory Judgment Act presents "a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." (quoting *Maryland Cas. Co. v. Pacific Coal & Oil Co.,* 312 U.S. 270, 273 (1941))).

## COUNT 2

### Equitable Cause of Action

75. Florida repeats and incorporates by reference ¶¶ 1–66.

76. Under the traditional equitable cause of action, courts may "enjoin unlawful executive action." *Armstrong*, 575 U.S. at 326–27. This cause of action "is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action." *Id.*

77. For the reasons discussed in Count 1, the federal government's attempt to thwart Florida's investigation vastly overreads § 351(f) and any enforcement of it would constitute illegal executive action.

## COUNT 3

### Violation of the Tenth Amendment

78. Florida repeats and incorporates by reference ¶¶ 1–66.

79. To the extent the Court rejects Counts 1 and 2 and adopts DOJ's broad reading of § 351(f), that provision violates the Tenth Amendment.

80. It does not create "a federal right to engage in certain conduct subject only to certain (federal) constraints." *Murphy*, 584 U.S. at 479.

81. Rather, it operates directly on the States by leaving state law completely intact but issuing a command to state officials regarding *when* they may exercise a sovereign function—here, enforcing state law.

82. By "dictat[ing] what" state officials "may and may not do," § 351(f) "violates the anticommandeering rule" of the Tenth Amendment. *Id.* at 474.

83. Put differently, a valid preemption provision is one that "regulates private actors" because "the Constitution 'confers upon Congress the power to regulate individuals, not States.'" *Murphy*, 584 U.S. at 477 (quoting *New York*, 505 U.S. at 166).

84. But § 351(f)—at least on DOJ's reading—does not regulate private individuals at all—it only tells the States when they may enforce an otherwise valid law against those private individuals.

85. As the Supreme Court recently held, "[t]he Supremacy Clause gives priority to the 'Laws of the United States,' not the criminal law enforcement priorities or preferences of federal officers." *Kansas v. Garcia*, 589 U.S. 191, 212 (2020).

86. For these reasons, to the extent the Court rejects Counts 1 and 2, § 351(f) violates the Tenth Amendment.

**PRAYER FOR RELIEF**

For these reasons, Florida asks the Court to:

a) Declare that Florida may conduct its investigation without violating § 351(f).

b) In the alternative, declare § 351(f) unconstitutional as applied to Florida.

c) Enjoin Defendants from enforcing § 351(f) in a manner that would prevent Florida from conducting its investigation.

d) Award costs and reasonable attorney's fees.

e) Award such other relief as the Court deems equitable and just.

Respectfully submitted,

Ashley Moody
ATTORNEY GENERAL

John Guard (FBN 374600)
CHIEF DEPUTY ATTORNEY GENERAL

*/s/ James H. Percival*
James H. Percival (FBN 1016188)
CHIEF OF STAFF

Henry C. Whitaker (FBN 1031175)
SOLICITOR GENERAL

Christine Pratt (FBN 100351)
COUNSELOR TO THE ATTORNEY GENERAL

Darrick Monson (FBN 1041273)
ASSISTANT SOLICITOR GENERAL

Office of the Attorney General
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
(850) 414-3300
(850) 410-2672 (fax)
james.percival@myfloridalegal.com

*Counsel for the State of Florida*